## THE JETHOU.

(District Court, D. Oregon. November 10, 1924.)

No. A-9304.

Shipping ☞84(3), 85 — Ship and contracting stevedore held liable for negligent injury to seaman.

Injury to libelant operating a winch in loading a cargo of lumber, caused by the breaking of a gooseneck attached to a boom which allowed the boom to swing out and strike him, *held* due to negligence of the ship in permitting the gooseneck to become defective and unsafe and to the concurrent negligence of the contracting stevedore in using the ship's loading tackle to move cars on a siding, for which purpose it was not designed, and contrary to instructions of the ship's officers.

In Admiralty. · Suit by Albert Rutherford against the steamship Jethou. Wilh. Wilhelmsen, claimant, and the Oregon & Ocean Corporation, impleaded. Decree for libelant against respondents jointly.

Wm. P. Lord and Arthur I. Moulton, both of Portland, Or., for libelant.

Wood, Montague & Matthiessen, of Portland, Or., for claimant and petitioner.

Bronaugh & Bronaugh and F. C. McDougal, all of Portland, Or., for respondent to petitioner.

WOLVERTON, District Judge. This is a libel to recover damages for personal injuries alleged to have been sustained because of the negligent acts of the Jethou. The Oregon & Ocean Corporation was later brought in, and it is charged by the Jethou that the injuries to libelant, whatever they were, are attributable to its negligent acts, and not to any suffered or committed by the Jethou.

A gooseneck attached to one of the booms broke, which allowed the boom to swing out, so that it struck libelant on his hip and body, causing the injuries of which he complains. The breaking of the gooseneck is attributed to the negligence of the ship in allowing it to become defective and unfit for use with safety to the workmen.

The ship claims that the Oregon & Ocean Corporation was negligent in attempting to move nine cars then on the railroad tracks by use of the ship's gear, and especially after having been warned by the ship's officers not to use the same for that purpose.

The Oregon & Ocean Corporation, at the time of the accident, was under contract with the Jethou for loading her with lumber, and was engaged in the performance of its contract. The lumber was being loaded from freight cars located on side tracks of the Southern Pacific Company on the dock alongside of the ship. It became necessary to spot some eight or nine of the cars, in order to have them convenient for hoisting the lumber therefrom for stowage in the ship.

There were five sets of gear, including the winches for operating the same, on the vessel, four of which were being used for loading. Libelant was in charge of winch No. 4.

According to Smith, the walking boss, he had directed that the four gears be attached to different sections of the line of cars, with the view of moving the cars for spotting. None had been attached, except the gear of No. 5 winch, which had been made fast to the rear car, and the winchman directed to take up the slack of the fall. But in doing this, it is obvious that the winchman did more; he exerted a considerable strain on the fall, otherwise the gooseneck would not have parted. The boom, with the gooseneck attached, had been used constantly for a long while for the different uses to which it was put, and had not given way until this juncture.

There is much dispute as to whether the longshoremen were attempting to move the cars on the track at the time. The master asserts very confidently that they were. The chief officer was not sure that the cars were coupled, but he says they had the wire on the after car, and were shoving all the rest ahead of it. Olsen, the chief engineer, testifies that the winch was running fast, and then came with a jerk; that it "was running fast, and it jumped." The testimony of Martin Jensen, the second officer, is to the same effect—that the pull was put on with a jerk. This he heard. He could hear the winch running fast, and then a crack when the boom came down.

The stevedores had been warned before this, by the ship's officers, not to use the gear for moving the cars. They deny that they had such warning, but in this they are manifestly mistaken. Only the day before a boom had carried away by the breaking of a gooseneck, while lifting heavy timber, and the officers were apprised that the longshoremen were moving cars on the siding with the gear, one and two cars at a time, and directed them not to use it for lifting such heavy lumber, and likewise not to use it for moving the cars. At the same time the chief officer advised them that there was a windlass on the forecastle and a winch on the poop, which they could use with a wire, a snatch-block and hook to attach the appliance to the cars, and that the ship had steam available for use of the anchor windlass if

they wanted to use it that way. The ship's officers are so clear, and so apparently fair in their evidence, with respect to having previously given the warning not to use the gear for moving the cars, that I am constrained to believe them against the contra proofs of the longshoremen. The gear was calculated or supposed to lift three tons, and was compound in the winch at the time.

While it is not unusual to use the loading gear for moving cars on sidings, it is clear that it is not designed for that purpose, and so to use it is to subject it many times to a strain it is not calculated to sustain. Nor should the longshoremen have attempted so to use the gear, in the instant case, contrary to the warning and admonition of the ship's officers.

As it respects the gooseneck that gave way, there can be no question that it was in grievously bad order. It was the pin that broke. The shoulder had worn away to such extent that it permitted a much heavier strain on the pin than if in good order. The pin had evidently been cracked previously, and the break showed evidence of crystallization. The appliance had evidently been poorly cared for, as it was badly rusted, and probably had at no time been greased or oiled, so as to obviate the wear.

I conclude, therefore: First, that the ship was negligent in operating the gear with the defective gooseneck; second, that the stevedore, the Oregon & Ocean Corporation, was negligent in failing to obey the warning of the officer not to use the gear for moving cars on the siding, and in so using it; and, third, that there was a concurrent liability as it respects the Jethou and the Oregon & Ocean Corporation for the injuries sustained by libelant.

The libelant was bruised about the hip, his back was weakened somewhat for the time, and his nervous system was somewhat impaired; but in no way was there permanent impairment to his health or ability to earn a livelihood. He was able to go to work again in about two months after the injury, and lost some time subsequently because thereof. Two and one-half months will fully cover his loss of time.

I allow for the injury, pain, and suffering, etc., $1,000; for loss of time, 2½ months, at $175 per month, $437.50; and for physician's services, $125—total, $1,562.50.

Libelant will have a decree for the amount against the Jethou and the Oregon & Ocean Corporation jointly, and for his costs and disbursements.